UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
EUGENE DIVISION

COMMODITY FUTURES TRADING
COMMISSION,

                Plaintiff,

                v.

ERIK J. HASS and SIMPLY GAINS, INC.,

                Defendants.

Case No.: 6:20-cv-934-AA

## CONSENT ORDER FOR
## PERMANENT INJUNCTION, CIVIL MONETARY PENALTY AND
## OTHER EQUITABLE RELIEF AGAINST ERIK J. HASS AND SIMPLY GAINS, INC.

### I.     INTRODUCTION

On June 9, 2020, Plaintiff Commodity Futures Trading Commission ("Commission" or "CFTC") filed a Complaint against Defendants Erik J. Hass and Simply Gains, Inc. ("Simply Gains") (collectively, "Defendants") seeking injunctive and other equitable relief, as well as the imposition of civil penalties, for violations of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1–26, and the Commission's Regulations ("Regulations") promulgated thereunder, 17 C.F.R. pts. 1–190 (2022).

### II.     CONSENTS AND AGREEMENTS

To effect settlement of all charges alleged in the Complaint against Defendants Hass and Simply Gains without a trial on the merits or any further judicial proceedings, Defendants:

1.     Consent to the entry of this Consent Order for Permanent Injunction, Civil Monetary Penalty, and Other Equitable Relief Against Defendants Hass and Simply Gains ("Consent Order");

2.      Affirm that they read and agreed to this Consent Order voluntarily, and that no promise, other than as specifically contained herein, or threat, has been made by the CFTC or any member, officer, agent, or representative thereof, or by any other person, to induce consent to this Consent Order;

3.      Acknowledge service of the summons and Complaint;

4.      Admit the jurisdiction of this Court over them and the subject matter of this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1;

5.      Admit the jurisdiction of the CFTC over the conduct and transactions at issue in this action pursuant to the Act;

6.      Admit that venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e);

7.      Waive:

(a)      Any and all claims that they may possess under the Equal Access to Justice Act, 5 U.S.C. § 504 and 28 U.S.C. § 2412, and/or the rules promulgated by the Commission in conformity therewith, Part 148 of the Regulations, 17 C.F.R. pt. 148 (2022), relating to, or arising from, this action;

(b)      Any and all claims that they may possess under the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121, tit. II, §§ 201–53, 110 Stat. 847, 857–74 (codified as amended at 28 U.S.C. § 2412 and in scattered sections of 5 U.S.C. and 15 U.S.C.), relating to, or arising from, this action;

(c)      Any claim of Double Jeopardy based upon the institution of this action or the entry in this action of any order imposing a civil monetary penalty or any other relief, including this Consent Order; and

(d)      Any and all rights of appeal from this action;

8.      Agree that the Commission is the prevailing party in this action for purposes of the waiver of any and all rights under the Equal Access to Justice Act and the Small Business Regulatory Enforcement Fairness Act of 1996, specified in subparts (a) and (b) of paragraph 7 above.

9.      Consent to the continued jurisdiction of this Court over them for the purpose of implementing and enforcing the terms and conditions of this Consent Order and for any other purpose relevant to this action, even if Defendants now or in the future reside outside the jurisdiction of this Court;

10.     Agree that they will not oppose enforcement of this Consent Order on the ground, if any exists, that it fails to comply with Rule 65(d) of the Federal Rules of Civil Procedure and hereby waive any objection based thereon;

11.     Agree that neither they nor any of their agents or employees under their authority or control shall take any action or make any public statement denying, directly or indirectly, any allegation in the Complaint or the Findings of Fact or Conclusions of Law in this Consent Order, or creating or tending to create the impression that the Complaint and/or this Consent Order is without a factual basis; provided, however, that nothing in this provision shall affect their: (a) testimonial obligations, or (b) right to take legal positions in other proceedings to which the CFTC is not a party.  Defendants shall comply with this agreement, and shall undertake all steps necessary to ensure that all of their agents and/or employees under their authority or control understand and comply with this agreement;

12.     Admit to all of the findings made in this Consent Order and all of the allegations in the Complaint;

13.     In Plea Agreement, *United States v. Hass*, 6:20-cr-00178-MC-1 (D. Or. Feb. 21, 2023), ECF No. 39, Hass pleaded guilty to violating 18 U.S.C. §§ 1341 and 1343, and in connection with that plea, admitted the facts set out in the transcript of his plea allocution Official Court Transcript of Proceedings, dated September 1, 2023, ECF No. 52, a copy of which

is attached as Exhibit A to this Order, and those same facts are admitted as if set forth in this Order;

14.     Consent to the use of the findings and conclusions in this Consent Order in this proceeding and in any other proceeding brought by the Commission or to which the Commission is a party or claimant, and agree that they shall be taken as true and correct and be given preclusive effect therein, without further proof;

15.     Do not consent, however, to the use of this Consent Order, or the findings and conclusions herein, as the sole basis for any other proceeding brought by the Commission or to which the Commission is a party, other than a: statutory disqualification proceeding; proceeding in bankruptcy, or receivership; or proceeding to enforce the terms of this Order;

16.     Agree to provide immediate notice to this Court and the CFTC by certified mail, in the manner required by paragraph 89 of Part VI of this Consent Order, of any bankruptcy proceeding filed by, on behalf of, or against them, whether inside or outside the United States; and

17.     Agree that no provision of this Consent Order shall in any way limit or impair the ability of any other person or entity to seek any legal or equitable remedy against Defendants in any other proceeding.

### III.     FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court, being fully advised in the premises, finds that there is good cause for the entry of this Consent Order and that there is no just reason for delay.  The Court therefore directs the entry of the following Findings of Fact, Conclusions of Law, permanent injunction and equitable relief pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, as set forth herein.

**THE PARTIES AGREE AND THE COURT HEREBY FINDS:**

A.     **Findings of Fact**

**The Parties to this Consent Order**

18.     Plaintiff Commodity Futures Trading Commission is an independent federal regulatory agency that is charged by Congress with administering and enforcing the Act and the Regulations.

19.     Defendant Erik J. Hass is a resident of Lane County, Oregon.  Hass is the President and sole owner of Defendant Simply Gains.  Hass has never been registered with the Commission in any capacity.

20.     Defendant Simply Gains, Inc. was incorporated in Oregon on January 30, 2013 and dissolved on March 28, 2019.  Its principal place of business was in Lane County, Oregon. Simply Gains has never been registered with the Commission in any capacity

**Overview of Defendants' Trading Activity**

21.     From March 2013 through February 2019 (the "Relevant Period"), Defendants had proprietary trading accounts in Simply Gains' name where Hass traded off-exchange leveraged or margined foreign currency exchange ("forex") contracts at several futures commission merchants ("FCMs").

22.     At least 21 individuals, including several who were not eligible contract participants ("ECPs") (collectively the "Pool Participants"), contributed more than $2,100,000 to Defendants for forex trading.  Hass withdrew more than $415,000 for himself and his wife and lost more than $1,084,000 by engaging in unprofitable forex trading.

**Solicitation Fraud**

23.     Defendants solicited prospective Pool Participants through in-person meetings, telephone calls, e-mails, text messages, and word of mouth, seeking out individuals who would agree to let Hass trade forex on their behalf through his company, Simply Gains.

24.     In soliciting prospective Pool Participants, throughout the Relevant Period, Hass, as a principal and agent of Simply Gains, made the following misrepresentations, among others:

   a.    Hass had become highly skilled in forex trading over the prior five years and had gained more than 2% each and every month for at least three years;

   b.    Hass would utilize his proven strategy to provide consistent returns of 2% per month to the Pool Participants' accounts;

   c.    Defendants would donate an additional 0.5% in returns per month to a charity of Pool Participants' choice;

   d.    Defendants would only take profits if Pool Participant deposits returned more than 2.5%  per month;

   e.    Pool Participants could avoid any loss of principal and interest by giving Defendants sixty days' notice prior to withdrawing funds;

   f.    Defendants would implement a stop-loss mechanism to ensure account risk does not exceed specified percentages, including a mechanism ensuring that losses could never exceed 20% of the account balance;

   g.    Forex trading is a suitable investment for the Pool Participants' ages, investment objectives, experience, and financial circumstances;

   h.    Defendants would issue 1099-INT tax forms to Pool Participants.

25.     At the direction of the Defendants, Pool Participants entered into written "unsecured promissory notes" with Simply Gains.  Hass provided the promissory notes to Pool Participants by e-mail or through other means or instrumentalities of interstate commerce. Although the participation interests were structured as loans, Pool Participants understood that their funds were being traded by Defendants and that trading profits would be the source of funds they received from Defendants.

26.    The unsecured promissory notes contained multiple false statements, including:

    a.    Interest would accrue to the Pool Participants at an expected fixed rate of 2% monthly;

    b.    Defendants would issue a monthly statement of interest and account balance;

    c.    Defendants would issue an annual 1099-INT form; and

    d.    With sixty days' notice, Pool Participants could close their accounts and withdraw their account balances, including all principal and interest.

27.    Instead of using all of the Pool Participants' funds to trade forex, as Hass had represented that Defendants would do, Defendants used portions of the Pool Participants' funds to pay down Hass's mortgage, to pay down Hass's credit card debt, and to pay for a Caribbean cruise and other of Hass's personal expenses.  Hass also misappropriated at least $10,000 each quarter from the Pool Participants' accounts to pay a "salary" to himself and his wife, regardless of whether the accounts had gained or lost money that quarter.

28.    Defendants Simply Gains and Hass deposited the remainder of the Pool Participants' funds in highly leveraged forex positions with no stop-loss procedures in place. The various forex trades made by Defendants suffered dramatic losses almost immediately upon being made.

**False Account Statements**

29.    Rather than accurately reporting the trading losses, Defendants represented to Pool Participants that their accounts were highly profitable and induced them to deposit further funds.

30.    To conceal from Pool Participants that their funds had been misappropriated and/or lost, Hass told some Pool Participants, both orally and in written purported account statements, that their deposits were making money month after month.  Hass reported to Pool

Participants that their accounts had obtained tens or hundreds of thousands of dollars in profits and that their account balances had increased by 60-70%. These statements were false.

31.     For example, one Pool Participant, who deposited $773,400 with Defendants via an Individual Retirement Account ("IRA"), received from Hass, periodically from about March 2014 until about July 2018, monthly statements falsely indicating that his account had interest gains totaling $476,561. Another Pool Participant who deposited $68,800 with Defendants received statements falsely indicating his deposit had earned $38,544 in interest from June 2013 through December 2017. These account statements falsely showed that the Pool Participants' accounts were increasing in value when in reality much of the money deposited had been misappropriated or lost.

32.     In February 2019, Hass emailed certain Pool Participants to tell them that Defendants had lost all of their money. This was the first time Defendants had disclosed any losses in the accounts to any of the Pool Participants.

**Misappropriation of Participant Funds**

33.     Defendants instructed Pool Participants to wire their funds to the Simply Gains's Credit Union Account, or to give Hass a check made out to Simply Gains. For funds held in retirement accounts, Defendants instructed Pool Participants to roll their accounts over to a self-directed IRA service and execute a form ordering the IRA service to "lend" the funds to Simply Gains in return for a note paying 2% monthly.

34.     Most, if not all, funds deposited with Defendants by Pool Participants during the Relevant Period were deposited into the Credit Union Account (either by wire transfers sent directly from Pool Participants, by Defendants depositing checks or cash received from Pool Participants, or by Defendants receiving retirement account funds from the IRA service).

35.    Hass was the sole signatory on the Credit Union Account during the Relevant Period.

36.    Defendants misappropriated more than $400,000 from the Credit Union Account, largely by initiating transfers to Hass's personal bank account and using the funds for Hass's personal benefit.

**Specific Examples of Defendants' Conduct**

37.    Pool Participant 1 contributed approximately half of the total funds solicited and received by Defendants.  Hass solicited a deposit from Pool Participant 1, who he knew personally because they attended the same church and had previously worked at the same employer.  Hass made various misrepresentations to Pool Participant 1 including, among other things, telling Pool Participant 1 that Hass had become highly skilled in forex trading, that Hass's historical average return on investment was 2-3.5% per month, that funds deposited would return profits of 2% per month to Pool Participant 1 plus 0.5% per month to a charity of Pool Participant 1's choice, that Hass would not get paid unless Pool Participant 1 made profits, and that a stop-loss mechanism was in place to avoid large losses.

38.    When Pool Participant 1 replied stating that the bulk of his available funds were in his employer's 401(k) account, Hass suggested that Pool Participant 1 could financially benefit by retiring early and rolling his 401(k) account into an IRA and depositing it with the Defendants.  Hass also provided Pool Participant 1 with a Simply Gains promissory note that contained multiple false statements, including that he could close his accounts and withdraw his account balances, including all principal and interest, without loss of funds with sixty days' notice.  On or about October 7, 2013, Pool Participant 1 deposited funds with the Defendants by wiring $75,330 from a family trust to the Credit Union Account.

39.     In November 2013, Hass sent Pool Participant 1 a statement falsely purporting to show that his account had increased in value by 1% during the last half of October 2013.  In reality, Defendants had lost more than 50% of the funds deposited in 2013, but Hass did not disclose those losses to Pool Participant 1.  The false account statement induced Pool Participant 1 to make further deposits and to quit his job so that he would be able to roll his 401(k) account into an IRA to deposit with the Defendants.  In reliance on the false account statement, between November 2013 and March 2014 Pool Participant 1 deposited an additional $1,129,575 (consisting of $123,213 on behalf of his family trust, $773,400 from his (now former) employer's 401(k), $173,012 from his savings account, and $59,950 from his wife's retirement account) with Simply Gains.

40.     Thereafter, Hass sent Pool Participant 1 false account statements purporting to show that Pool Participant 1's accounts were profitable.  According to the final account statements showing account balances through April 2018, Pool Participant 1's accounts showed a total balance of $1,792,881.

41.     On or about March 8, 2018, Pool Participant 1 asked to withdraw $75,000 from his retirement account.  For nearly a year Hass offered a series of excuses for why funds could not be returned to Pool Participant 1.  During this time Hass encouraged Pool Participant 1 to deposit the proceeds from the sale of his mother's house with Defendants and asked Pool Participant 1 to identify ten individuals who may be interested in making deposits with Defendants.  Hass ultimately admitted to Pool Participant 1 that he had lost all of Pool Participant 1's funds.

42.     Pool Participant 2 also lost all of the funds she had deposited due to Defendants' false statements and misappropriation.  In early 2018, after Defendants had spent or lost virtually

all of the funds that had been entrusted to them, Hass posted an advertisement online seeking an employee to help him generate leads for new Pool Participants. Pool Participant 2 responded to Hass's advertisement and discussed the job opportunity with Hass. Using the same false statements about how Defendants traded, Hass encouraged Pool Participant 2 to contribute funds to Simply Gains herself to learn how the business worked before inducing others to deposit funds. Pool Participant 2 agreed and deposited $50,000 of her retirement assets with Simply Gains on or around April 27, 2018. Rather than making forex trades with the funds, as Hass had promised, Defendants used Pool Participant 2's funds to pay back other Pool Participants in the manner of a Ponzi scheme.

43.    Defendants lost most or all of the Pool Participants' funds that were actually traded. Defendants utilized accounts at several forex trading brokers to execute trades. At one such forex broker ("Broker 1") Defendants opened two accounts and deposited $730,000 in Pool Participant funds between March 2014 and January 2015. In these Broker 1 accounts, Defendants traded the EUR/USD currency pair using leverage of 50:1 with no stop-loss mechanism. By January 2018, Defendants' disastrous trading had caused losses of more than $647,000 in the Broker 1 accounts. Of the remaining $83,000, Hass misappropriated a portion and the remainder was paid out to certain Pool Participants who had demanded that Defendants return their funds.

44.    In total, of the at least $2,100,000 deposited by Pool Participants, Hass misappropriated at least $415,000 and Defendants lost at least $1,084,000 by trading with no stop-loss mechanism in place.

45.     Defendants did not inform any Pool Participant that his or her account had suffered losses, and Hass continued to solicit additional deposits and tout his trading track record even after his trading accounts had been wiped out.

46.     To date, despite repeated requests to Hass for the return of their funds, most Pool Participants have not received their funds back from the Defendants.

47.     To the extent some Pool Participants have received funds back from Defendants, those funds were misappropriated by Defendants from other Pool Participants, in the nature of a Ponzi scheme.

**Failure to Register with the CFTC**

48.     During the Relevant Period, Defendant Simply Gains, through Defendant Hass, acted by operating or soliciting funds for a pooled investment vehicle that is not an eligible contract participant and that engages in retail forex transactions.

49.     During the Relevant Period, Hass solicited customers and prospective customers for participation in a pooled investment vehicle, while associated with Simply Gains as a partner, officer, employee, or similar agent.

50.     During the Relevant Period, Simply Gains was not registered with the Commission as a commodity pool operator ("CPO"), and Hass was not registered with the Commission as an associated person ("AP") of a CPO.

**Hass Acted as Controlling Person for Simply Gains**

51.     During the Relevant Period, Hass controlled all aspects of Simply Gains's operations.  Hass was the founder, President, and sole owner of Simply Gains.  Hass told Pool Participants that he was responsible for the trading at Simply Gains and was generally the sole source of information for Pool Participants regarding Simply Gains and their accounts.  Hass

controlled the Simply Gains Credit Union Account, into which Pool Participants transferred funds for the purpose of trading forex.

**B.      Conclusions of Law**

**Jurisdiction and Venue**

52.      This Court possesses jurisdiction over this action pursuant to 28 U.S.C. § 1331 (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (providing that U.S. district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).  Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), provides that the CFTC may bring actions for injunctive relief or to enforce compliance with the Act or any rule, regulation, or order thereunder in the proper district court of the United States whenever it shall appear to the CFTC that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

53.      Venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e), because Defendants reside in this jurisdiction and the acts and practices in violation of the Act occurred within this District.

**Fraud in Connection with Forex Transactions by Fraudulent Solicitation and Misappropriation**

54.      Section 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. § 6b(a)(2)(A)-(C), makes it unlawful for any person, in or in connection with any order to make or the making of any contract of sale of any futures contract to:  (A) cheat, defraud or attempt to cheat or defraud another person; (B) to willfully make any false statement or report to another person; and (C) to willfully deceive or attempt to willfully deceive any other person by any means whatsoever in regard to any order

13

or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for such other person.

55.     Section 2(c)(2)(C)(iv) of the Act, 7 U.S.C. § 2(c)(2)(C)(iv), provides that 7 U.S.C. § 6b(a)(2)(A)-(C) also applies to Defendants' forex transactions "as if" they were a contract of sale of a commodity for future delivery.

56.     Regulation 5.2(b)(1) and (3), 17 C.F.R. § 5.2(b)(1)-(3) (2022), makes it unlawful for a person by use of the mails, or any means or instrumentality of interstate commerce, directly or indirectly, in or in connection with any retail forex transaction:  (1) to cheat or defraud or attempt to cheat or defraud any person; (2) willfully to make any false report or statement to any person; or (3) willfully to deceive or attempt to deceive any person by any means whatsoever.

57.     During the relevant period, Defendants violated 7 U.S.C. § 6b(a)(2)(A)-(C) and 17 C.F.R § 5.2(b)(1)-(3), by, among other things:

    a.  Falsely claiming to Pool Participants that Hass was a highly successful forex trader with a consistent track record of profitable trading;

    b.  Falsely promising Pool Participants that their funds would be used to trade forex;

    c.  Falsely promising Pool Participants that their funds would generate profits of 2% per month without possibility of losses of more than 20%;

    d.  Falsely promising Pool Participants that additional returns would result in contributions to charities of their choosing;

    e.  Falsely promising Pool Participants that they could withdraw their funds with sixty days' notice;

    f.  Issuing false written account statements to Pool Participants; and

    g.  Misappropriating Pool Participants' funds for Hass's personal benefit and to pay other Pool Participants in the nature of a Ponzi scheme.

58.    Defendants committed the acts and practices described above using instrumentalities of interstate commerce, including the use of interstate wires for transfer of funds.

59.    Defendants committed the acts and practices described herein willfully, or with reckless disregard for the truth.

60.    The foregoing acts, omissions and failures of Hass, and of all other agents of Simply Gains, occurred and are occurring within the scope of their employment, office, or agency with Simply Gains; therefore, Simply Gains is liable for these acts, omissions, and failures pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2022).

61.    Hass directly or indirectly controls Simply Gains, and did not act in good faith or knowingly induced, directly or indirectly, Simply Gains's violations alleged in this Count, and is thus liable for Simply Gains's violations pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

**Fraud by a CPO and an Associated Person of a CPO**

62.    Section 4*o*(1) of the Act, 7 U.S.C. § 6*o*(1), makes it unlawful for CPOs and APs of CPOs:

> [B]y use of the mails or any other means or instrumentality of interstate commerce, directly or indirectly—(A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or (B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

63.    During the Relevant Period, Simply Gains, through Hass, acted as a CPO as defined in Section 11(A)(i)(II) of the Act, 7 U.S.C. § 11(A)(i)(II), by operating, or soliciting funds for, a pooled investment vehicle that is not an ECP and that engages in margined or

leveraged forex transactions described in Section 2(c)(2)(C)(i) of the Act, 7 U.S.C. §2(c)(2)(C)(i).

64.     Hass acted as an AP of a CPO by associating with a CPO as a partner, officer, employee, consultant, or agent in a capacity that involved the solicitation of funds, securities, or property for participation in a pooled investment vehicle.

65.     Simply Gains, through Hass, and Hass in his individual capacity, violated 7 U.S.C. § 6o(1)(A)-(B), in that by use of the mails or any other means or instrumentality of interstate commerce, they employed or are employing a device, scheme, or artifice to defraud actual or prospective Pool Participants, including individuals who were not ECPs, or engaged or are engaging in transactions, practices, or a course of business which operated or operates as a fraud or deceit upon actual or prospective Pool Participants, including non-ECPs.

66.     Hass directly or indirectly controls Simply Gains, and did not act in good faith or knowingly induced, directly or indirectly, Simply Gains's violations alleged in this Count, and is thus liable for Simply Gains's violations pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

67.     The foregoing acts, omissions and failures of Hass, and of all other agents of Simply Gains, occurred and are occurring within the scope of their employment, office or agency with Simply Gains; therefore, Simply Gains is liable for these acts, omissions and failures pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2022).

**Failure to Register as a CPO in connection with forex**

68.     Section 4m(1) of the Act, 7 U.S.C. § 6m(1), makes it unlawful for any CPO, unless registered with the CFTC, to make use of the mails or any means or instrumentality of interstate commerce in connection with its business as a CPO.

69.     Section 2(c)(2)(C)(iii)(I)(cc) of the Act, 7 U.S.C. § 2(c)(2)(C)(iii)(I)(cc), makes it unlawful for any person, unless registered in such capacity as the CFTC shall determine, to operate or solicit funds for any pooled investment vehicle that is not an ECP, in connection with leveraged or margined forex transactions described in Section 2(c)(2)(C)(i) of the Act.

70.     Regulation 5.3(a)(2)(i), 17 C.F.R. § 5.3(a)(2)(i) (2022), requires any CPO as defined in Regulation § 5.1(d)(1), 17 C.F.R. § 5.1(d)(1) (2022), engaged in retail forex transactions defined in Regulation 5.1(m), 17 C.F.R. § 5.1(m) (2022), to register as a CPO.

71.     Simply Gains has never been registered as a CPO.

72.     Simply Gains does not qualify for a CPO registration exemption under either the Act or the Regulations.

73.     Simply Gains, through the relevant period, used the mails, wires, or other instrumentalities of interstate commerce in or in connection with its activities as a CPO, in connection with commodity futures and forex trading, while failing to register as a CPO. Consequently, it violated 7 U.S.C. §§ 6m(1) and 2(c)(2)(C)(iii)(I)(cc) and 17 C.F.R. § 5.3(a)(2)(i).

**Failure to Register as an AP of a CPO in connection with forex**

74.     Section 4k(2) of the Act, 7 U.S.C. § 6k(2), makes it unlawful for any AP, unless registered with the CFTC, to solicit funds, securities or property for participation in a commodity pool or to supervise any person or persons so engaged.

75.     Section 2(c)(2)(C)(iii)(I)(cc) of the Act, 7 U.S.C. § 2(c)(2)(C)(iii)(I)(cc), makes it unlawful for any person, unless registered in such capacity as the CFTC shall determine, to solicit or accept orders from any person that is not an ECP, in connection with leveraged or margined forex transactions described in Section 2(c)(2)(C)(i) of the Act.

76.    Regulation 5.3(a)(2)(ii), 17 C.F.R. § 5.3(a)(2)(ii) (2022), requires any AP of a CPO as defined in Regulation § 5.1(d)(2), 17 C.F.R. § 5.1(d)(2) (2022), engaged in retail forex transactions defined in Regulation 5.1(m) to register as an AP.

77.    By reason of the conduct described above, Hass was a partner, officer, employee, consultant, or agent of Simply Gains, and he was involved in the solicitation of funds, securities or property for participation in Simply Gains's commodity pool, including from non-ECP Pool participants or prospective participants.

78.    Hass was not registered with the Commission as an AP.

79.    By reason of the foregoing, Hass violated 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc) and 6k(2) and 17 C.F.R. § 5.3(a)(2)(ii).

**Prohibited Activities of a CPO**

80.    Regulation 4.20(a)(1), (b), and (c), 17 C.F.R. § 4.20(a)(1), (b), (c) (2022), require a CPO to operate its pool as an entity cognizable as a legal entity separate from that of the pool operator, to solicit and receive funds in the pool's name, and to refrain from commingling the property of any pool that it operates with the property of any other person, respectively.

81.    During the Relevant Period, Simply Gains, acting through Hass and while acting as a CPO:  (i) failed to operate the commodity pool as a legal entity separate from Simply Gains, the CPO; (ii) received Pool Participant funds in the name of Simply Gains, rather than in the name of the commodity pool; and (iii) commingled the property of the commodity pool with the funds of Simply Gains and Hass.

82.    By reason of the foregoing, Simply Gains violated 17 C.F.R. § 4.20(a)(1), (b), (c) (2022).

## IV.    PERMANENT INJUNCTION

**IT IS HEREBY ORDERED THAT:**

83.    Based upon and in connection with the foregoing conduct, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, Defendants are permanently restrained, enjoined and prohibited from directly or indirectly:

a.    Cheating or defrauding, or attempting to cheat or defraud, other persons in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery that is made, or to be made, for or on behalf of, or with, any other person in violation of Section 4b(a)(2)(A) and (C) of the Act, 7 U.S.C. § 6b(a)(2)(A)-(C);

b.    Cheating or defrauding, or attempting to cheat or defraud, or willfully deceiving or attempting to deceive other persons in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, swap, that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market, in violation of Regulation 5.2(b)(1)-(3), 17 C.F.R. § 5.2(b)(1)-(3) (2022);

c.    While operating as a commodity pool operator or an associated person of a commodity pool operator, employing any device, scheme, or artifice to defraud any client or prospective client, or engaging in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant, in violation of Section 4o(1)(A) and (B) of the Act, 7 U.S.C. §§ 6o(1)(A), (B);

d.      Making use of the mails or any means or instrumentality of interstate commerce

in connection with its business as a CPO without registration with the CFTC as a

CPO, in violation of Section 4m(a) of the Act, 7  U.S.C. § 6m(1), or operate or

solicit funds for any pooled investment vehicle that is not an ECP, in connection

with leveraged or margined forex transactions, without registration with the

CFTC as a CPO, in violation of Section 2(c)(2)(C)(iii)(I)(cc) of the Act, 7 U.S.C.

§ 2(c)(2)(C)(iii)(I)(cc), and Regulation 5.3(a)(2)(i), 17 C.F.R. § 5.3(a)(2)(i)

(2022);

e.      Soliciting a client's or prospective client's discretionary account or supervising

any person or persons so engaged, without registration with the CFTC as an AP in

violation of Section 4k(2) of the Act, 7 U.S.C. § 6k(2), or soliciting or accepting

orders from any person that is not an ECP, in connection with leveraged or

margined forex transactions, in violation of 7 U.S.C. § 2(c)(2)(C)(iii)(I)(cc) and

Regulation 5.3(a)(2)(ii).17 C.F.R. § 5.3(a)(2)(ii) (2022), and/or;

f.      Failing to operate a commodity pool as a legal entity separate from the CPO,

receiving Pool Participant funds in the name of the CPO, rather than in the name

of the commodity pool, or commingling the property of the commodity pool with

the funds of any other person, in violation of Regulation 4.20(a)(1), (b), and (c),

17 C.F.R. § 4.20(a)(1), (b), (c) (2022).

84.    Defendants are also permanently restrained, enjoined and prohibited from directly

or indirectly:

a.      Trading on or subject to the rules of any registered entity (as that term is defined

in Section 1a(40) of the Act, 7 U.S.C. § 1a(40));

b.      Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2022), for their own personal account or for any account in which they have a direct or indirect interest;

c.      Having any commodity interests traded on their behalf;

d.      Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

e.      Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

f.      Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2022); and/or

g.      Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2022)), agent or any other officer or employee of any person (as that term is defined in 7 U.S.C. § 1a(38)), registered, exempted from registration or required to be registered with the Commission except as provided for in 17 C.F.R. § 4.14(a)(9).

## V.      RESTITUTION AND CIVIL MONETARY PENALTY

### A.      Restitution

85.    Defendants' violations of the Act and Regulations merit the award of restitution. However, this Court recognizes that the court in a related criminal action, entitled *United States v. Erik Hass*, Case No. 6:20-cr-00178-MC, has ordered that the Defendant pay restitution in the

amount of One Million, Seven Hundred Fifty-six Thousand, One Hundred Seventy-Five dollars and eighty-four cents ($1,756,175.84) to the defrauded customers of the Defendants in connection with the same conduct at issue in this action. Accordingly, restitution is not ordered in this action.

**B.    Civil Monetary Penalty**

86.    Defendants shall pay, jointly and severally, a civil monetary penalty in the amount of eight hundred and thirty thousand dollars ($830,000) ("CMP Obligation").  If the CMP Obligation is not paid immediately, then post-judgment interest shall accrue on the CMP Obligation beginning on the date of entry of this Consent Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Consent Order pursuant to 28 U.S.C. § 1961.

87.    Defendants shall pay their CMP Obligation and any post-judgment interest, by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order.  If payment is to be made other than by electronic funds transfer, then the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

> MMAC/ESC/AMK326
> Commodity Futures Trading Commission
> 6500 S. MacArthur Blvd.
> HQ Room 266
> Oklahoma City, OK 73169
> 9-amc-ar-cftc@faa.gov

If payment by electronic funds transfer is chosen, Defendants shall contact Tonia King or her successor at the address above to receive payment instructions and shall fully comply with those instructions.  Defendants shall accompany payment of the CMP Obligation with a cover letter that identifies Defendants and the name and docket number of this proceeding.  Defendants shall

simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial

Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street,

NW, Washington, D.C. 20581.

**C.    Provisions Related to Monetary Sanctions**

88.    Partial Satisfaction:  Acceptance by the CFTC of any partial payment of

Defendants' CMP Obligation shall not be deemed a waiver of their obligation to make further

payments pursuant to this Consent Order, or a waiver of the CFTC's right to seek to compel

payment of any remaining balance.

## VI.    MISCELLANEOUS PROVISIONS

89.    Notice:  All notices required to be given by any provision in this Consent Order

shall be sent certified mail, return receipt requested, as follows:

Notice to CFTC:

    Robert T. Howell
    Deputy Director
    Commodity Futures Trading Commission
    Division of Enforcement
    77 W. Jackson Blvd
    Chicago, IL 60604

Notice to Defendants:

    Erik Hass
    FCI Sheridan
    27072 Ballston Road
    Sheridan, OR 97378

All such notices to the CFTC shall reference the name and docket number of this action.

90.    Change of Address/Phone:  Until such time as Defendants satisfy in full their

CMP Obligation as set forth in this Consent Order, Defendants shall provide written notice to the

Commission by certified mail of any change to their telephone number and mailing address

within ten calendar days of the change.

91.    Entire Agreement and Amendments:  This Consent Order incorporates all of the terms and conditions of the settlement among the parties hereto to date.  Nothing shall serve to amend or modify this Consent Order in any respect whatsoever, unless:  (a) reduced to writing; (b) signed by all parties hereto; and (c) approved by order of this Court.

92.    Invalidation:  If any provision of this Consent Order or if the application of any provision or circumstance is held invalid, then the remainder of this Consent Order and the application of the provision to any other person or circumstance shall not be affected by the holding.

93.    Waiver:  The failure of any party to this Consent Order or of any pool participant at any time to require performance of any provision of this Consent Order shall in no manner affect the right of the party or pool participant at a later time to enforce the same or any other provision of this Consent Order.  No waiver in one or more instances of the breach of any provision contained in this Consent Order shall be deemed to be or construed as a further or continuing waiver of such breach or waiver of the breach of any other provision of this Consent Order.

94.    Waiver of Service, and Acknowledgement:  Defendants waive service of this Consent Order and agree that entry of this Consent Order by the Court and filing with the Clerk of the Court will constitute notice to the Defendants of its terms and conditions.  Defendants further agree to provide counsel for the CFTC, within thirty days after this Consent Order is filed with the Clerk of Court, with an affidavit or declaration stating that Defendants have received and read a copy of this Consent Order.

95.    Continuing Jurisdiction of this Court:  This Court shall retain jurisdiction of this action to ensure compliance with this Consent Order and for all other purposes related to this

action, including any motion by Defendants to modify or for relief from the terms of this Consent Order.

96.    Injunctive and Equitable Relief Provisions: The injunctive and equitable relief provisions of this Consent Order shall be binding upon Defendants, upon any person under their authority or control, and upon any person who receives actual notice of this Consent Order, by personal service, e-mail, facsimile or otherwise insofar as he or she is acting in active concert or participation with Defendants.

97.    Authority: Erik Hass hereby warrants that he is President and sole owner of Simply Gains, and that this Consent Order has been duly authorized by Simply Gains and he has been duly empowered to sign and submit this Consent Order on behalf of Simply Gains.

98.    Counterparts and Facsimile Execution: This Consent Order may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered (by facsimile, e-mail, or otherwise) to the other party, it being understood that all parties need not sign the same counterpart. Any counterpart or other signature to this Consent Order that is delivered by any means shall be deemed for all purposes as constituting good and valid execution and delivery by such party of this Consent Order.

99.    Contempt: Defendants understand that the terms of the Consent Order are enforceable through contempt proceedings, and that, in any such proceedings they may not challenge the validity of this Consent Order.

100.    Agreements and Undertakings: Defendants shall comply with all of the undertakings and agreements set forth in this Consent Order.

There being no just reason for delay, the Clerk of the Court is hereby ordered to enter this

*Consent Order for Permanent Injunction, Civil Monetary Penalty, and Other Equitable Relief*

*Against Defendants Erik J. Hass and Simply Gains, Inc.* forthwith and without further notice.


**IT IS SO ORDERED** on this _14th_ day of _____February_____, 2024.

  _/s/Ann Aiken_____
                                        **UNITED STATES DISTRICT JUDGE**



CONSENTED TO AND APPROVED BY:



_____          _____/s/ Douglas G. Snodgrass_____
Erik J. Hass                                        Douglas G. Snodgrass
President and Sole Owner                            Commodity Futures Trading Commission
Simply Gains, Inc.                                  77 W Jackson Blvd.
                                                    Chicago, IL 60604
Date: _____                        (312) 596-0663
                                                    dsnodgrass@cftc.gov


_____
Erik J. Hass, individually

                                                    Dated __2/6/2024_____
Date: _____



Approved as to form:

_____
Michelle Holman Kerin, OSB #965278
Angeli Law Group
Attorney for Simply Gains Inc. and Erik
Hass

There being no just reason for delay, the Clerk of the Court is hereby ordered to enter this *Consent Order for Permanent Injunction, Civil Monetary Penalty, and Other Equitable Relief Against Defendants Erik J. Hass and Simply Gains, Inc.* forthwith and without further notice.

**IT IS SO ORDERED** on this _____ day of _____, 2023.

_____
**UNITED STATES DISTRICT JUDGE**

CONSENTED TO AND APPROVED BY:

_____
Erik J. Hass
President and Sole Owner
Simply Gains, Inc.

Date: 11/16/23

_____
Erik J. Hass, individually

Date: 11/16/23

Approved as to form:

_____
Michelle Holman Kerin, OSB #965278
Angeli Law Group
Attorneys for Simply Gains Inc. and Erik Hass

_____
Douglas G. Snodgrass
Commodity Futures Trading Commission
77 W Jackson Blvd.
Chicago, IL 60604
(312) 596-0663
dsnodgrass@cftc.gov

Dated _____

26